THE NORTH RIVER STEAM BOAT COMPANY, appellants,
*against*
JOHN R. LIVINGSTON, respondent.

The acts of the legislature of this state, granting to *Robert R. Livingston* and *Robert Fulton* the exclusive navigation of all the waters within its jurisdiction, with boats moved by fire or steam, for a term of years, are repugnant to that clause of the constitution of the *United States*, which authorizes congress to regulate commerce, so far as those acts prohibit vessels licensed, according to the laws of the *United States*, for carrying on the coasting trade, from navigating those waters by means of fire or steam

The terms " coasting trade," mean commercial intercourse, carried on between different districts in different states, different districts in the same state, or different places in the same district, on the sea coast, or on a navigable river.

The power to regulate commerce among the states, conferred by the federal constitution, extends to the coasting trade.

What is meant by the terms " internal commerce of the state."

The constitution of the *United States* should be so construed, as best to promote the great objects for which it was made ; avoiding the two extremes of a liberal, or strict construction.

Commercial defects in the articles of confederation considered, with the objects of the federal constitution on that head.

The powers given to the general government are to be first satisfied. Some of these are exclusive—some concurrent ; and when concurrent, the provisions of the general government are paramount.

For certain purposes, the general government is a single consolidated one. In this character, congress executes its powers.

Congress have no right, under their power of regulating commerce, to interfere with the ferries of the state, except so far as they are used for carrying on the coasting trade ;

Nor can they interfere with the navigation upon our canals, or inland lakes or rivers ;

But, under their taxing power, they may tax canal boats, or any other property.

An injunction should not be granted, in order to secure a claim to statute privileges, if the right be doubtful.

An order of the court of chancery was, as to part of the right, against the appellants, from which they appealed, and, as to another part in their favor, from which neither party appealed ; *held*, that though the respondent could not question that part of the order which was for the appellants, yet he might argue against the reasons and ground upon which it was made, it appearing that if they failed, there could be no foundation for the appeal.

A judge allowed to withdraw from his seat, he being interested.
So where he had relations who were interested.
But this privilege was denied to a judge, who requested to withdraw, upon
the ground that he had formed and expressed an opinion.

APPEAL from the Court of Chancery. After the decision in
the *Steam-Boat Company* v. *Livingston*, (1 *Hopkins' Ch. Rep.*
151) *June 14th*, 1824, refusing an injunction against an indi-
rect intercourse between the cities of *New-York* and *Albany*,
to be carried on by the defendant's steam-boat, the *Olive
Branch*, by way of *New-Jersey*, the plaintiffs, by leave of the
Court below, upon petition presented, and an order made,
*June 28th*, 1824, amended their bill, so as to charge the de-
fendant, that, though on the first passage of his boat from
*New-York* to *Albany*, he caused her to stop opposite and ad-
joining the city of *Jersey*, in the state of *New-Jersey*, yet
such stopping was collusive and fraudulent, and intended to
evade the operation and effect of the laws of this state,
granting an exclusive right of navigation by steam-boats,
and not for any *bona fide* purpose of commercial intercourse;
and that since her first trip, although she had performed up-
wards of 50 passages between the cities of *New-York* and
*Albany*, yet she had never, in the course of any one of them,
stopped at, opposite, or adjoining any port or place in the
state of *New-Jersey*, but had prosecuted such passages direct
from a wharf in the city of *New-York*, to a wharf in the city
of *Albany*, &c. stopping always at intermediate places upon
the *Hudson*, where it was probable that passengers might be
procured. The amended bill then prayed an injunction
against such direct intercourse; and all such indirect inter-
course, by way of *New-Jersey*, unless in the prosecution of
a *bona fide* voyage, or for the purpose of a *bona fide* com-
mercial intercourse, to or with some place in *New-Jersey*,
and not for the purpose of evading the laws of this state rel-
ative to steam-boats.

Order to shew cause, &c.

This amended bill, being duly verified by various affida-
vits, copies of the petition, order for amendment, &c.
and affidavits were, pursuant to the order, served upon the

defendant on the *1st July*, 1824 ; on the *6th*, the motion for an injunction was argued before the Chancellor; who, on the *9th* of *July*, 1824, made an order, that, so far as the complainants asked an injunction, to prohibit the navigation of the steam-boat *Olive Branch* to or from another state, the motion should be denied; and it was further ordered, that an injunction should issue, restraining the defendant from navigating the steam boat *Olive Branch*, in the waters between the cities of *New-York* and *Troy*, when there was no voyage made by the boat to or from another state.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

*July* 19*th*, 1824, the plaintiffs appealed to this Court, from so much of the order as denied an injunction, to prohibit the navigation to or from another state.

For a statement of the case in the Court below, previous to presenting the petition to amend, with the opinion of his honor the Chancellor upon it, see 1 *Hopkins' Ch. Rep.* 150, 198 *to* 212.

The reasons in support of that branch of the last order, to which the appeal immediately related, were thus assigned by

THE CHANCELLOR. Since the decision of the former application for an injunction, the complainants have amended their bill ; and several affidavits are also now laid before the court. From the amended bill and these affidavits, it appears, that since the voyage upon which the former application was founded, the Olive Branch has been constantly engaged, and is now employed in navigation between the cities of Albany and New York, without proceeding to any other state.

Upon the facts now before the court, the complainants ask an injunction, to restrain the defendant from navigating the Hudson, in any direct voyage between ports in this state, and also, from navigating circuitously, by stopping in New Jersey, unless such stopping shall be in the prosecution of a voyage or commerce intended in good faith, and not for the purpose of evading the state grant.

One object of this application, is, to prevent a circuitous navigation through another state, where the sole purpose of

the passage to or from another state, may be to continue the voyage to other ports in this state, and where the circuitous voyage would not take place, if a direct voyage between ports in this state, were free.

For the complainants, it is urged, that a circuitous navigation through another state, is a fraud upon their right; that fraud vitiates every thing; and that when it is evident, that a circuitous voyage through another state, would not take place, if a voyage confined to the state were open, such a circuitous voyage should be regarded and treated as a fraud, and should not be permitted.

That the rights of one should be so used, as not to encroach upon the rights of another; that things which the laws do not permit to be done directly, can not be done by artifice or circuity; and that fraud can not prevail; are general principles, which are clear and undisputed. But have these principles any application to this case? The solution of this question must depend upon the true nature and extent of the different rights, which are here in question.

The right of the defendant is derived from a law of the united states; and that of the complainants from a law of a state; and to a great extent, these laws are in conflict with each other. Between such laws and such rights, so far as conflict exists, there can be no action like that of opposing powers; no equal rights entitled to equal support; and no reconciliation of adverse rights to the same thing. The law of the united states is supreme; and the law of the state is wholly without efficacy, so far as the supreme law extends. The state law is annihilated, so far as the ground is occupied by the law of the union; and the supreme law prevails, as if the state law had never been made. The supremacy of constitutional laws of the union, and the nullity of state laws inconsistent with such laws of the union, are principles of the constitution of the united states. Thus, this case is entirely different from any of those, in which various rights derived from one lawgiving source, may exist together, and all may claim scope for their exercise.

What then is the right which has been adjudged to belong to steam vessels licensed for the coasting trade? It is, as I

ALBANY,
Feb. 1825.

Steam Boat
Company.
v.
Livingston.

understand the supreme court of the united states, a right of free intercourse by navigation, from state to state; a right to navigate freely, from one state to another, in all cases. It is the same right which a licensed vessel using sails, has, to proceed from state to state. It is not merely a right to transport merchandize or passengers, or to carry on commerce in any particular manner; but it is a right to engage in every thing which constitutes the coasting trade, and for that purpose, to navigate from state to state, whatever may be the intention of any particular voyage. This seems to me to be the meaning of the supreme court: and such being the right conferred by a law of the union, this right must have its full effect, notwithstanding any law of a state.

The complaint now made, is, that a right given by a law of the state, may be impaired or impeded in its effect, by the exercise of a right given by a law of the union. The answer to this complaint, is, that so far as the law of the union acts upon the case, the state law is extinguished; and that such opposing rights to the same thing, can not coexist under the constitution of our country.

If a vessel may in this manner, do that circuitously, which the same vessel may not do directly, this effect is produced by the division of legislative powers between different governments, and by express laws which distinct governments have enacted. It is one of the results of that complex system of government, which has no parallel, in its peculiar structure and the distribution of its powers. If a vessel may navigate between this state and another, it is because a law of the union, has made such a voyage lawful; and if the same vessel may not navigate between two ports of this state, it is because a law of the state, has made such a voyage unlawful. The law of the state, is, that all its waters are subject to an exclusive right of navigation; and the law of the union, as it is expounded by the supreme court, is, that a licensed vessel may navigate the same waters in any voyage to or from another state. These laws are to a great extent, inconsistent; but in a certain other extent, they are not incompatible. Those waters of this state, which are not navigable to or from another state, remain subject in ef-

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

fect, to the exclusive grant of this state, because from their situation, the right to navigate from state to state, can not be there exercised. In those waters of this state, which are navigable to or from another state, the law of this state no longer excludes licensed vessels navigating to or from another state. Where from the contiguity of waters of this state to other states, a voyage to or from an adjoining state may be easily made, a circuitous voyage through an adjoining state, may as a fact, be little more than a direct voyage within this state. But the two cases are still different ; and are governed by different laws, made in virtue of distinct powers of legislation. If the laws now in question operate in this manner, it is because navigation between this state and others, is subject to the legislation of the union ; while navigation wholly within the state, is subject to the legislation of the state, so far as the laws of the state may operate in subordination to those of the union. The effect of these different laws thus understood, is to open those waters of the state, which are the theatre of navigation between this state and other states, whenever such a navigation takes place, and in no other case ; and to leave the navigation of those waters in other cases, and the navigation of waters which are wholly internal, in all cases, subject to the state grant.

If the several rights which are here claimed, had emanated from one government possessing all the powers which are divided between the union and the states, the argument concerning fraud and circuity, would be applicable to rights so arrayed against each other ; and the courts of justice might then, so enforce and protect such rights, as to reconcile them equitably, with each other. But when one right is derived from a law of the union, and an opposing right from a law of a state, all the judges of this country, are bound to ascertain the extent of the right given by the law of the union, and to give effect to that right as fully, as if the state law had not been made. The interference of a state law with a constitutional law of the union, is ascertained, not for the purpose of reconciling repugnant provisions and opposing rights, but in order to declare the state law null.

For these reasons, I am of opinion, that the doctrines concerning fraud, can have no application to this case, or to any analogous case, arising under a constitutional law of the union and a law of a state. The constitution of the united states gives the principle, which must govern all such cases. The law of the union first has its full operation; and so much only of the state law, as is not abrogated by the effect of the supreme law, remains. This principle destroys all incongruities, and is the only legitimate test, of which such cases are susceptible. The right given by a law of the union, to navigate from state to state, can not be abridged or restricted by a state law; and whenever a case of navigation between this state and another takes place, the state grant is extinct, as an impediment or objection to such a voyage.

In my examinations of this subject, I have endeavored to ascertain what has been adjudged by the supreme court of the united states, and to discuss those questions of the controversy, which that court has not determined. The supreme court has fully determined the question of navigation from state to state; and in every thing concerning that question, I follow the supreme court. In respect to navigation within the state, in cases not comprehended by the decision of the supreme court, I have given my reasons for thinking, that a license for the coasting trade, does not confer any right inconsistent with the state grant. The general result from the decision of the supreme court, the former decisions of the courts of this state, and all the views which have been taken, is, that the state grant remains in force, in those cases in which the right to navigate from state to state, does not intervene; and that where this paramount right intervenes, the law of this state is wholly void. The portion of the state grant which remains, is that fragment of the right granted, which may have effect, after the law of the union shall first have had its full operation; and nothing more of the state grant can remain in force. The state grant is in force, only when and where, the right to navigate from state to state, is not exercised.

So far as the complainants ask an injunction to prohibit the navigation of the Olive Branch to or from another state,

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

the application is refused ; and an injunction to restrain the defendant from navigating that vessel, in the waters between the cities of New York and Troy, when there is no voyage to or from another state, is granted.

*T. J. Oakley*, for the appellants, said the decretal order, in part appealed from, consisted of two distinct branches : so far as the motion below related to an injunction against a fraudulent intercourse between *New-York* and *Troy*, by way of *New-Jersey*, it was denied ; but so far as it related to a direct intercourse between those cities, it was granted. The latter was upon the principle, that the state laws are operative, and confer upon the appellants an exclusive right to the direct navigation. In this branch of the decree, both parties have acquiesced ; neither has appealed ; and he supposed that, for all the purposes of the present discussion, it must be laid entirely out of view, with the principles upon which it was bottomed ; and that the attention of the Court would be directed, exclusively, to the ground upon which the voyage by the way of *New Jersey* was allowed. By not appealing, he supposed the respondent had conceded the validity of the state laws in respect to internal navigation ; and would not be allowed to question them here. He mentioned this, because it might be important to understand how counsel would consider it ; and he did not know how to obtain the direction of the Court upon the subject. To his mind it was clear, that, not having appealed from that part of the order which was against the respondent, gentlemen could not now oppose the reasons upon which it was founded.

*J. V. Henry*, for the respondent, did not wish the gentleman to remain in the dark, as to the course which the counsel for the respondent intended to pursue. With leave of the Court, they should contest the whole grounds upon which the order, in both its branches, proceeded. No concession made by counsel, or omission to appeal, could alter the constitutional ground. If the counsel for the respondent could prove that the Supreme Court of the *United States*, in *Gibbons* v. *Ogden*, (9 *Wheat.* 1) had made a decis-

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

ion embracing and definitively settling the controversy in their favor as to both branches of the order, they have a right to do so. He had contended for this in the Court below, and intended to pursue the same train of argument here. He was not precluded by the decree. The whole subject came up by the appeal made in behalf of the company; and, upon this ground, counsel had a right to consider all the arguments with which it was connected.

*A. Van Vechten,* (same side) would add one word to what had fallen from his associate. Gentlemen come here to get rid of an order allowing them an exclusive right to a direct intercourse, with their boat, between *New-York* and *Troy;* but giving the respondent a common right with them to ply between those cities by way of *New-Jersey.* From the latter branch of the order they appeal. Now, if we shew that they have already got more than they are entitled to, this Court will not enlarge the order in their favor. If it turns out that they have no right to either branch of the decree, upon any ground, or in other words, if all fails them, they can not retain a part. They are certainly bound to establish an exclusive right within this state, before they can set up one in *New-Jersey.* If they fail in the former, the latter goes of course. True, we cannot appeal, till the final hearing. The order is technically binding till then; but the principle of the whole order remains open. The two questions which it involves can not be separated.

*Henry,* briefly examined the several reported cases in relation to the steam boat controversy, concluding with that of *Gibbons* v. *Ogden,* in 9 *Wheat.* 1, with a view to show that the subject was completely opened by that decision, which, in his opinion, disposed of both grounds; and in order to show that the discussion was not to be limited by the maxim *stare decisis,* upon the supposition that any decision heretofore made by this Court was not completely done away by the decree of the *United States* Court.

*Oakley,* had barely alluded to the difficulty which the case presented, for the purpose of learning of gentlemen what

Vol. III.　　　　92

course they intended to pursue, or, if it was proper, taking the direction of the Court. He did not intend, now, and perhaps it would be unnecessary at any stage of the discussion, to follow the gentleman in a review of the authorities to which he had referred. This might be material, if the Court should consider the questions open upon both branches of the decree. He would like to understand, if the Court thought gentlemen had a right to contend that an order against them, from which they had not appealed, was erroneous. True, they may appeal from the final decree. So may the appellants ; but the time has gone by for questioning this interlocutary order, on their part. This being a Court whose jurisdiction is strictly appellate, they cannot notice any thing which does not come up in the form of an appeal. The exclusive right of the appellant within the state is conceded. It is out of the question as to this cause, and the respondent must be silent upon it. He is estopped by his own neglect ; and the only inquiry which this Court will make is, as to the ulterior right of indirect navigation.

*T. A. Emmet*, for the appellants, said the difference between counsel related to a simple matter of practice ; not how the question concerning the last branch of the order should be discussed, (for that would be settled when they reached it in the course of argument,) but whether it should be examined at all. This Court directs its attention to the matter appealed from. The order appealed from has a double aspect, only one of which is looked to by the appeal. This injunction is merely interlocutory process, which may be dissolved at the final hearing in the Court below. The respondent may then apply for its dissolution ; and, if refused, he may appeal. But the 15 days, to which the appeal from an interlocutory order is limited, have gone by ; and whether gentlemen can now get it up by a side wind, is the question. He had always thought that whenever a party was dissatisfied with an order or decree, if he intended to be relieved from it, he must appeal, or be concluded. If both parties are dissatisfied, both must appeal.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

[TALLMADGE, President, did not understand the counsel for the respondent as claiming to disturb the order for an injunction. On the contrary, they acquiesce in this ; but they claim to maintain the proposition that no injunction whatever should be granted, by way of answer to the appeal which claims an injunction as to a particular branch of navigation. In discussing the narrower proposition, they claim to go into the broader one as material in its support.]

[WOODWORTH, J. should, for himself, at any rate, considering the nature and importance of this controversy, which related to a great constitutional question, be inclined to hear the counsel at large, reserving the point of practice. But he did not feel any difficulty in saying that the ground of the whole order was fairly open to discussion, in the form which the matter now assumed. To be sure, the respondent's counsel had precluded themselves from a direct appeal, by their acquiescence beyond the period of limitation ; but suppose they satisfy the Court, not only that the respondent has a right to the indirect navigation by way of *New-Jersey ;* but establish the broader proposition, that they have a right in all respects equal to that of the appellants. This, to be sure, would go to the order for an injunction, which is unappealed from ; but it would also be the most powerful reason in answer to the appeal.]

[SUTHERLAND, J. said the respondent was content with the whole order ; and willing to submit to its operation, provided it could be entirely retained. The appellants are, however, dissatisfied with a part, and come here to reverse it ; and all the respondent now claims is, the right to answer, " Here was an order, one branch of which was for you, and one branch for me ; you come to reverse the latter, and claim the whole. I now put you to your whole title. I insist you have no title whatever. The whole fails ; and of course, you have no right to a part."]

[SAVAGE, Ch. J. was clear that counsel should be at liberty to go into the whole question. If they could maintain the respondent's title to a general and unqualified navigation

between *New York* and *Troy*, this certainly included the lesser proposition, that he might navigate on the same route by way of *New-Jersey* ; and would be conclusive against the appeal.]

The other members of the Court being unanimously of this opinion, the cause was then argued at large, by

*Oakley*, for the appellants ;

*Van Vechten & Henry*, for the respondent ; and

*Emmet*, in reply.

The arguments did not differ materially from those used by the same counsel, and by Mr. *Haines*, in the court below, which will be found well reported by Mr. *Hopkins*, in his first volume of Chancery Reports, 151 to 198, to which the reader is referred.    And I omit them here, the rather, because. they are mostly noticed in the learned and eloquent opinions of Mr. Justice WOODWORTH and Chief Justice SAVAGE, who, it will be seen, with other members of the Court, differed as to the order which should be made here.
Previous to the argument,

COLDEN and SPENCER, Senators, were allowed, on their request, to withdraw from their seats in Court; the former, on the ground that he was interested, and the latter on the ground that he was related to persons having an interest, in the event of the cause.

OGDEN, Senator, in the course of the argument, said he had long since formed an opinion upon the questions under. discussion, which he had freely expressed to others, and endeavored to enforce with what little power of argument he was master of.   And he asked leave, for this reason, to withdraw from his seat, and take no part in the decision.

[SUTHERLAND, J. did not think Mr. *Ogden* could be excused on this ground.   The question is one of law, not of fact ; and a Judge having formed and expressed an opinion,

did not come within the principle which would make this a cause of challenge to a juror.]

ALBANY, Feb. 1825.

Steam-Boat Company v. Livingston.

[WOODWORTH, J. understood Mr. OGDEN not only to have formed an opinion, but to be so wedded to that opinion that he could not yield it. As a juror, upon a question of fact, he clearly would not be received; and though being a Judge, he could not be challenged for this cause; yet, he inclined to think the Court might, in their discretion, excuse him.] But

*A majority* of the Court overruled the request of Mr. Ogden, and he continued in his seat.

WOODWORTH, J. The appellants are entitled to all the interest and property, which *Robert R. Livingston* and *Robert Fulton* had, to the exclusive right and privilege of navigating steam-boats on that part of the waters of the *Hudson River*, between *New-York* and *Troy*. This right has frequently been questioned in the Courts of this state. Every objection that the ingenuity of counsel could suggest, has heretofore been presented for consideration, and overruled by our highest Court of justice.

It would be a waste of time minutely to review those decisions. They must be considered as of binding authority, until a higher tribunal shall have pronounced them erroneous. On this point, there is probably no difference of opinion. Wretched, indeed, would be the state of the community, if it were otherwise. Individual rights would depend on the fluctuating opinions of different men, sitting in the same courts—what is declared to be law to-day, might not be law to-morrow. The evils growing out of such a system are too apparent to require comment. It must, however, be understood, that this doctrine is not to be carried so far as to sanction error. It will sometimes happen, that the principle upon which a cause ought to be decided, has been overlooked, or mistaken—sometimes the rule, as settled by former adjudications, has been misapplied. In these and similar cases, it is undoubtedly proper to review and correct; but it is always expected that manifest error be pointed out. If precisely the same questions have been before decided,

*Importance of adhering to the maxim stare decisis.*

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

Decisions of
this state and
the United
States, upon
the steam-boat
laws.

and the same arguments considered, they have the highest claim to conclusiveness in the Courts where they were pronounced.

That the decisions on the exclusive right of *Livingston* and *Fulton*, are of this character, is abundantly manifest. In the cause of *Livingston* v. *Van Ingen*, (9 *John.* 507) the several acts of the legislature granting this monopoly, are decided to be constitutional and valid. It is true, that the effect of a license under the *United States*, for carrying on the coasting trade, was not then drawn in question—the respondents had not obtained any such license ; but it was objected, that the state laws interfered with the power given to congress, " to regulate commerce with foreign nations and among the several states, and with the Indian tribes." It was held, that all the internal commerce of the state, by land and water, remained entirely and exclusively within the scope of the original sovereignty. In the case of *Ogden* v. *Gibbons*, (4 *John. Ch. Rep.* 150) it was decided, that these acts were constitutional, and that the license gave the vessel an American character, while the right of the individual procuring the license, to use the vessel, as against another individual, setting up a distinct and exclusive right, remained. precisely as it did before. The decree was affirmed by this Court. (17 *John.* 488.) The Supreme Court of the *United States* reversed that decree, and it is contended, that the reversal was upon the grounds litigated in the cause now before us. If this be so, it becomes our duty to give that decision its full effect, as proceeding from a Court of paramount and controling jurisdiction.

The latter
should have
their full ef-
fect ;

But should
be confined to
the case under
consideration.

Before I proceed to discuss this point, it is proper to observe, that the extent of the decision in the case of *Gibbons* v. *Ogden*, is to be limited, as it was in *Sturges* v. *Crowninshield*, (4 *Wheat.* 122.) The Court there say, *that their opinion is confined to the case actually under consideration*. In the case of *Mather* v. *Bush*, (16 *John.* 248) the Supreme Court of this state proceeded on that ground, and held, that between that case, and *Sturges* v. *Crowninshield*, there was a material and manifest distinction ; that a full and fair effect to the decision in *Sturges* v. *Crowninshield*, ought to be given, so far, and so far-

only, as that Court had actually decided ; that it would be
unfit and irregular, to analyse the reasoning and illustra-
tions in the opinion delivered, any farther than to show, that
the point then presented was not intended to be decided ;
and that we were not called upon to take a step in advance
of the Supreme Court of the *United States.* To the opinion
delivered in *Mather* v. *Bush,* I fully assented, both as to the
result and the reasons assigned. On further reflection, I see
no cause to recede from the ground then taken. I proceed
to inquire—

*First,* What was the precise point in issue, in the case of
*Gibbons* v. *Ogden,* and what was decided ?

*Secondly,* Does the case before us present the same
question ?

*Thirdly,* If the respondent has the right to navigate his
steam boat from *New-Jersey* to *New-York,* under a license to
carry on the coasting trade, is he in the fair exercise of that
right, by proceeding from *New-York* to *New-Jersey,* and from
thence to *Albany,* unless the voyage shall be for the purpose
of carrying on such trade *bona fide,* and not for the purpose
of evading the state grant ?

The bill of *Ogden* alleged, that by virtue of his exclusive
right, he run a steam-boat, called the *Atalanta,* between the
city of *New-York* and *Elizabethtown Point ;* that the defen-
dant, *Gibbons,* was the owner of two boats impelled by steam,
and in contravention of the exclusive right of the plaintiff,
had set in motion the said boats, and employed them in the
trasportation of passengers, between the city of *New-York*
and *Elizabethtown ;* and that they then actually navigated be-
tween those places. An injunction was granted, restraining
the defendant from navigating his boats on the waters of this
state, between *Elizabethtown* and *New-York.* The answer
admitted, that the boats were intended to navigate between
*New-York* and *Halsted's Point,* in *New-Jersey ;* and that they
did run, and continue so to do, until restrained by the injunc-
tion. The defendant averred, that his boats were duly en-
rolled, and licensed under the laws of the *United States,* to
be employed in carrying on the coasting trade ; and insisted,
that under the license, they might lawfully be employed in

*Margin notes:*

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

Points.

What was the
issue in *Gib-
bons* v. *Ogden,*
(9 *Wheat.* 1.)

the coasting trade, between parts of the same state, or of different states, and could not be excluded or restrained therein, by any law or grant of a particular state, on any pretence to an exclusive right to navigate the waters of any particular state by steam-boats. The residue of the answer presents a distinct ground of defence, not connected with the present inquiry.

The preceding is a concise statement of the pleadings, on which the Supreme Court of the *United States* adjudicated. What, then, was in issue between these parties? Certainly not whether the license conferred a right to navigate between two points in this state, when the voyoge is not a continuation of a passage to or from another state. The reasons in support of this proposition appear to me conclusive. *Ogden* claimed no right to a navigation of that description. He merely claimed the right to run his boat from *Elizabethtown* to *New-York*. His purchase extended no farther. The bill complained of the invasion of this right solely. If the answer sets up a right more extensive than that asserted in the bill, it puts in issue only so much as applies to the case made by the bill. What goes beyond, may or may not be well-founded. Let it be either, it seems necessarily to follow, that the plaintiff is not called on to admit or deny it. As to him, it may be considered as irrelevant matter, unless the whole case made by the answer depends on one and the same principle. The answer alleges a right, under the license, to navigate steam-boats from *New-York* to *Elizabethtown*. This meets the case made by the bill. If it also claims a right, under the license, to navigate from *New-York* to *Albany*, without reference to the commencement or termination of the voyage in *New-Jersey*, in this respect it goes beyond the bill, and is not matter in issue between the parties, unless the decision of the first necessarily decides the second. If the two questions are not precisely the same; if there are well-founded doubts whether the establishment of the right to navigate between *New-York* and *New Jersey*, proves the right to navigate the whole extent of the *Hudson;* and more especially, if there are substantial grounds of argument to resist the right claimed, in the latter case, which do

Not the right
to navigate be-
tween       two
points in this
state.

An answer
does not put in
issue any thing
not applicable
to the bill, tho'
it be more ex-
tensive than
the bill.

not apply to the other, it can not safely be said, that a decision on one controls the other. It requires a clear and explicit adjudication of the higher tribunal, on the point, before the respondent is entitled to rest on the ground of authority.

I have supposed that *Gibbons* claimed, in his answer, the right set up by the respondent. I think it manifest, however, that he did not. A right to employ his boat in the coasting trade, between different states, is all that seems to be claimed. If this protected the defendant, in running his boats from *Jersey* to the city of *New-York*, against the exclusive privilege of the plaintiff, it was all the defendant desired, and all that necessarily came in question. The boats were employed in that navigation only, and for that purpose the answer alleges they were intended. To that extent the decision of the Supreme Court of the *United States* is definite and certain. The defendant run no boat under the circumstances presented in the case before us. It was, therefore, a mere speculative question, whether the exclusive privilege must yield to the license, in such a case. I admit it was incidental to, and in some degree, but not inseparably, connected with the right to run boats from *Elizabethtown* to *New-York*. Unless, therefore, the Supreme Court of the *United States*, in language not to be mistaken, have considered the two cases to be the same, or that the license would equally extend to authorize a navigation between two places within the state, I am not disposed to anticipate, or go in advance of their opinion. Resort, then, must be had, in the first place, to the decree itself, and then to the reasoning upon which it is founded.

The question of exclusive right to navigate directly between two points within the state, was merely speculative in *Gibbons* v. *Ogden;* incidental, but not inseparably so, to the main question.

The language of the decree is, that the license to carry on the coasting trade, gave full authority to navigate the waters of the *United States*, by steam or otherwise, *for the purpose of carrying on the coasting trade*, any law of the state of *New-York* to the contrary notwithstanding. This was the point decided, and nothing more. It was all the appellant required, to obtain a reversal. Chief Justice *Marshall* observes, " the coasting trade is a term well understood ; the law has defined it, and all know its meaning perfectly ; the

The decree, in that case, must be limited to the coasting trade.

act describes, with great minuteness, the various operations of a vessel engaged in it; and it can not be doubted, that a voyage from *New-Jersey* to *New-York*, is one of those operations." This, then, is the basis upon which the decree rests. It is a particular specification of the point decided by the Court. The remaining parts of the decree, where general terms are employed, must be understood as conforming to that specification. It is analogous to the principle which governs in the construction of other instruments. Where there is a particular recital, or enumeration of particulars, to which the instrument is to apply, subsequent general words shall be qualified by the particular recital. When, therefore, the Court afterwards declare, "that so much of the several laws of the state of *New-York*, as prohibits vessels licensed according to the laws of the *United States*, from navigating the waters of the state of *New-York*, by means of fire or steam, is repugnant to the constitution, and void," does it authorize a navigation for carrying on a trade wholly internal, within the waters of a state? Evidently not, unless the coasting trade is declared to extend, not only to commerce between the states, but also to internal commerce within the state. When, therefore, the decree speaks of navigating the waters of the state by fire or steam, the words, "*for the purpose of carrying on the coasting trade,*" are necessarily understood. So, also, in the last clause, where the Court say, that the " decree of this Court, which perpetually enjoins *Gibbons* from navigating the waters of this state, by steam or fire, is erroneous," must receive the same construction; so that the whole decree may hold an uniform language, and correcrly state the precise point involved in the decision.

But it is contended, that the opinion delivered embraces the present case, and sanctions the right claimed by the respondent. I have already suggested my views, as to the reasoning and illustrations which Courts may assign in support of their judgments, and that, generally speaking, we tread on unsafe ground, if we depart from the point actually decided.

In discussing the general nature of the power to regulate commerce among the states, and the effect of a license to

carry on the coasting trade, the right of the state over its internal commerce was considered. But it is no where asserted, in the opinion delivered, that the license to carry on the coasting trade, extends to the commerce of a state purely internal. If, from the reasoning, we may conjecture, or even think it probable, that the superior tribunal may, on a future occasion, carry the doctrine to that extent, we are not justified in reversing what has been solemnly and repeatedly adjudged in our own Courts on such grounds. It must either be on the ground of an express decision by paramount authority, or that, on a consideration of the new points of view, in which the question is presented, we are satisfied the former decisions are erroneous.

The Chief Justice considers the power of regulating commerce, as extending to the regulation of navigation, and that commerce " among the several states," comprehends every species of commercial intercourse; that it can not stop at the external boundary line of each state, but may be introduced into the interior. But it was " not intended to say, that these words comprehend commerce, which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to, or affect other states." And, again, he observes, " the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration pre-supposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be *the exclusively internal commerce of a state*. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the state generally, but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself."

ALBANY, Feb. 1825.

Steam-Boat Company v. Livingston.

and reverse the decision of this court, because the S. C. of the *U. S.* would from their language, probably do this, on the question coming before them.

Their language considered

Extent of the power to regulate commerce among the states.

ALBANY,
Feb. 1825.

Steam Boat
Company
v.
Livingston.

It does not
include' inter-
nal commerce.

Commerce, then, among the states, as explained by the Supreme Court of the *United States*, does not include internal commerce. It is that which proceeds from one state to another. A voyage in the prosecution of such a commerce, may be continued from port to port, and place to place, on the internal waters of the state. Thus, a voyage direct from *Elizabethtown* to *Albany*, is commerce among the states, and the vessel may touch at any intermediate port. In the opinion delivered, the question is put, " can a trading expedition, between two adjoining states, commence and terminate outside of each ? And if the trading intercourse be between two states, remote from each other, must it not commence in one, terminate in the other, and probably pass through a third ?' Commerce among the states must, of necessity, be commerce with the states." This language seems to me incapable of being mistaken. In discussing the constitutional powers of congress, under the clause to regulate " *commerce among the states*," the Chief Justice kept steadily in view, a commerce directly from one state to another, and that, so far as that was concerned, all state regulations in collision must yield. The general expressions in the opinion, " that the power of congress must be exercised whenever the subject exists, and if it exists within the states, then the power of congress may be exercised within a state," are all to be understood as qualified and limited, so as to protect the commerce from one state to another.

The whole scope of the reasoning is, to show the extent of the power of congress on this subject ; that it is, in its nature, *exclusive*, and consequently does not admit of participation by the states. It is conceded, in the opinion delivered, that the direct power of congress to regulate commerce among the states, does not operate on the internal commerce of a state, but that such internal commerce may be considered as reserved for the state itself.

Where the *termini* of a voyage are both within a state, the navigation is not subject to the direct power of congress.

I have attempted to show, what species of commercial intercourse is intended by the words " commerce among the states." If I am correct in the construction put upon the reasoning of the Chief Justice, it follows, that a navigation from port to port, where the *termini* of the voyage are both

within a state, is not within the direct power given to con-
gress, but is under state control, except in certain cases,
which I will directly point out.  In pursuing this subject, it
must be kept in mind, that I am not examining this as an
original question. but to ascertain what ground is covered by
the decision of the Supreme Court : to that extent it will
receive our sanction.

The opinion clearly maintains, that although the states
have the power of legislating on the subject of their internal
commerce, and no *direct power* is given to congress on this
subject : yet that a collision may sometimes take place, and
consequently that the law of congress, if within their delega-
ted powers, being the supreme law of the land. must pre-
vail.  This collision did exist in the case of *Ogden* v. *Gib-
bons ;* for although it be admitted that the state has a right
to regulate its internal commerce, the power is subject to
this limitation, that whenever that regulation interferes
with the power of congress, so far as it interferes, it is inop-
erative and void.  The Supreme Court considered the steam
boat monopoly as the exercise of a right strictly commer-
cial, and that therefore it must yield to a paramount law of
congress, made in pursuance of the constitution.  By the
license under that law, *Gibbons* was authorized to navigate
from *New Jersey* to any port or place in this state.  To that
extent the state law is in collision, and to that only has the de-
cree reference in the following sentence : " that so much of
the several laws of the state of *New York* as prohibits ves-
sels licensed. according to the laws of the *United States,* from
navigating the waters of the state of *New-York* by means of
fire or steam, is repugnant to the constitution and void."  It
was argued that a construction put on the words, " com
merce among the states," like that which obtained the sanc-
tion of the Supreme Court, would subvert state inspection
laws, health laws, turnpike roads and ferries. But it was an-
swered, as to these, that although having a considerable influ-
ence on commerce, the right to pass them was not derived
from the power to regulate it, but formed a portion of that
mass of legislation within a state, not surrendered to the
general government.  Certain it is, that according to the ex-

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

Yet a collision
between a U.
S. & state law
may sometimes
exist, when
the state law
must yield.

Inspection
laws, health
laws, turnpike
roads and fer-
ries remain
subject to state
legislation.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

Gibbons could
not set up a
ferry between
the cities of
Jersey and
New-York.

If congress
have an inci-
dental or con-
current power
over the inter-
nal commerce
of the state,
they have not
exercised it.

planation given by the Court, of the terms " commerce among the states," they can not be defended as commercial regulations. It is because they are not so considered, that they are not affected by a law of congress. On this ground *Gibbons* could not set up a ferry between the city of *Jersey* and *New York :* it would not be a commerce within the meaning of the constitution, and consequently the state grant of the ferry would be valid. These points I consider as decided, and do not feel myself at liberty to question them.

The opinion delivered, supposes that the subjects of internal state regulation may be also affected in another way by the general government. The proposition is thus laid down : "If the legislative power of the union can reach them, it must be for national purposes ; it must be where the power is expressly given for a special purpose, or is clearly incidental to some power expressly given." (9 *Wheaton*, 203, 204.) It is here proper to remark, that the *act of congress for licensing vessels to be employed in the coasting trade*, must be considered as an act passed in the exercise of their *express powers ;* it is to give effect to those powers exclusively. It does not profess to call in aid of the express power, any incidental power, nor can it be collected from the act, whether congress claim the right of interfering with the purely internal commerce of the state, in consequence of any incidental power. Admitting that congress may, on this principle, support the right to pass laws, in collision with the internal regulations of a state, the only consequence is, that so far, and to that extent, the general and state governments have concurrent powers ; and no question can arise upon them, until they come in conflict. There is nothing, then, in the principle which bears upon the present question ; for congress have not yet attempted to exercise any incidental power, at variance with the state right to regulate its internal commerce.

Opinion of
C. J. Marshall
seems to admit
that if the
power exist, it
is an incident-
al, not a direct
power in con-
gress.

The example given by the Chief Justice, as to the manner in which the incidental power may be exercised, as I understand it, has an important bearing upon the principal question, what is commerce among the states ? He says, page 204, " If congress license vessels to sail from one port

to another in the same state, the act is supposed to be ne-
cessarily incidental to the power expressly granted to con-
gress, and implies no claim of a direct power to regulate the
purely internal commerce of a state, or to act directly on its
system of police." The case put, seems to be the very case
under consideration, "a vessel sailing from one port to an-
other in the same state." This is an implied admission,
that it does not fall within the express power of congress to
regulate commerce among the states, and could only be
reached, if reached at all, by the exercise of what is called a
power incidental to the power expressly given.

According to the view I have taken, the question to be
decided is narrowed down to a single proposition : Does
the direct power of congress to regulate commerce among
the states, include the right of regulating commerce be-
tween two points in the same state, when there is no voy-
age to or from another state ? I have endeavored to show
that it does not ; and that if there is an incidental power,
which, when called into action, might bear on internal state
legislation, the answer is, it is not exclusive, and no such
power has yet been exercised : when it is, it will be time
enough to consider its validity.

It does not seem to me that the law of congress, or
the license granted under that law, can make any difference,
according to the view taken by the Supreme Court ; for it
necessarily results, that if congress have the exclusive pow-
er to regulate commerce among the states, (and so it is held,)
the states have no power at all to legislate on the subject.
Their acts must be void, whether congress had passed any
law regulating the coasting trade or not. The right, it is
true, to carry on the coasting trade, is held to be derived
from the license ; but if it were not so, the same conse-
quences would result as respects the appellants. Their claim
for an injunction would then rest on a law, inoperative and
void, so far as it comes in collision with the constitutional
power of congress. It could not be supported, whether the
license gave a right to the respondent, or was only evidence
of the character of the vessel. The whole question depends

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

The ques-
tion here is
narrowed to-
the single
proposition,
whether con-
gress have a
direct power
to regulate
commerce,
simply be-
tween two
points in the
same state.

The right to
regulate com-
merce among
the states is
exclusive in
congress, and
can not be
touched by a
state, whether
congress have
acted or not.
The license can
make no dif-
ference; and
in this view,
the question is,
what is meant
by " commerce
among the
states?"

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

But the act
of congress and
license are ma-
terial as forti-
fying the con-
struction of
the powers of
congress.
The act is a
plenary exer-
cise of their
power as to
commerce by
water.
The terms,
"coasting
trade" do not
apply to com-
merce confined
to the internal
waters of a
state.

on this : what is meant by the expression, "commerce among the states ?"

But the act of congress, and the license under it, may, I apprehend, be advantageously considered, for the purpose of fortifying the construction given to the powers of congress on this subject.

I consider the act regulating the coasting trade, as a plenary exercise of the powers of congress under the constitution, so far as navigation, or a commerce by water, is concerned. The act has given no definition as to the extent of this right. The sense of congress seems to be, that the "coasting trade" is coextensive with the direct power "to regulate commerce among the states." It does not assert any other or greater right. Does, then, the coasting trade, within its legitimate meaning, apply to a commerce carried on by a citizen of a state, exclusively on the internal waters of the same state ?

When words are employed, which had previously received a known interpretation, they are to be construed in that manner, unless a different intent is plainly indicated. When the constitution of the *United States* was adopted, it found the states in the possession and exercise of a coasting trade ; each state had a right of prescribing its own regulations ; the citizens of one state, when navigating the waters of another state, were obliged to conform to its regulations. Subject to to these, they might navigate from one state to another, and to any port or place within a state. This was the coasting trade as generally understood. A voyage proceeding from another state to this state, would be the coasting trade, whether the vessel terminated her voyage at the city of *New-York*, or proceeded on her voyage to *Albany*. It would, within the meaning of the terms, be a coasting trade, although the internal waters of the state form no part of the coast. The trade had reference to an intercourse between states, which might be carried into the interior of a state, if there were navigable waters: but with respect to a trade purely internal, between different parts of the same state, I am not aware that it was ever considered within the meaning

of those terms. It would have been novel, I apprehend, if not unintelligible language, to speak of the coasting trade on the *Hudson River*. It seems therefore to my mind a fair inference, that congress never contemplated that the license gave a right to navigate the internal waters of a state, unless in the prosecution of a coasting trade from state to state; but intended to limit it to a commerce of the latter description.

The grievance in this case is, that the respondent navigates a steam boat from *New-York* to *Albany*, notwithstanding the exclusive right of the appellants. The injunction does not, according to the view I have taken, interfere or come in collision with the license.

But it is contended that *this* is a coasting trade from state to state, inasmuch as the boat of the respondent on her voyage from *New-York*, stops in *New Jersey*, and from thence proceeds to *Albany*. The appellants allege that it is collusive and fraudulent, intended to evade the operation of the laws of this state, and not for any *bona fide* purpose of commercial intercourse. In confirmation of this, they charge that the respondent's steam-boat stopped adjoining the city of *Jersey*, but did not land or take on board any goods, wares, merchandize, or passengers whatever. On this state of facts, the question recurs, what is authorized by the license? It is a coasting *trade* from one state to any other port or place in another state. The law of the state excluding the entry of such vessels is in collision; but the collision exists only, when the *trade* is carried on. The meaning of the license is, that you may enter the waters of *New York* for the purpose of trade; a state law can not prevent your entry. If for other purposes, the license can not be called to your aid. I think this evident from the following considerations:

It is commerce only among the states that congress is authorized by the constitution to regulate. The license can not have a more extensive operation than the power from which it is derived; consequently it can only act upon *commerce*. The commerce specified is the coasting trade, and to that it is confined. To say that a vessel proceeding from *New-York* to the wharf in the city of *Jersey*, without any

ALBANY,
Feb 1825.

Steam-Boat
Company
v
Livingston.

What can not
lawfully    be
done directly,
can not be done
indirectly.

communication with the shore, without landing or taking on board goods or passengers, is a trade within the meaning of the license, is to my mind a gratuitous assertion ; but when to this is added, that the touching at *New-Jersey* seems to have been for the purpose of fraudulently evading the laws of this state, and not for any *bona fide* purpose of commercial inter- course ; when it is evident, that the inducement was to bring the respondent within the decision in the case of *Og- den* v. *Gibbons,* some of the land marks of the law must be- removed, before the doctrine can be sanctioned.   No prin- ciple is better settled than this : what cannot lawfully be done directly can not be done indirectly.   This circuitous voyage was in evasion of the laws of this state ; the touching at *New- Jersey* was colourable only.   *The affidavit of the respondent has not denied that it was an evasion.*   Indeed, the whole scope of the respondent's argument has been directed to shew that the Chancellor's opinion is incorrect, in considering a voyage commencing and terminating in this state as not pro- tected by the license ; while that part which relates to touch- ing at a port in another state, in the course of the voyage, has scarcely been urged.   It may be laid down as a general principle, that whenever an act is done *in fraudem legis,* it can not be the basis of a suit, in the Courts of the country, whose laws are attempted to be infringed. (*Jackson* v. *Jack- son,* 1 *John.* 435.)   The fraudulent act is considered as no act ; it is the same as if nothing had been done ; and although I do not think it necessary to lay any stress on the intention with which the act was done, because the facts do not con- stitute *a coasting trade,* yet I think the principle applicable, both as it respects the act of congress and the laws of this state,   The attempt is to convert into a *bona fide* coasting trade, what is so in point of form, and colorable only ; and to make it the basis on which to resist successfully the laws of this state.   Neither can succeed.   The respondent must abide the decision of the Court on the other grounds.

Decree of
the chancellor
should be re-
versed ; and in-
junction go a-
gainst an indi-

My opinion is, that the decree of his honor the Chancel- lor be reversed, and that an injunction issue restraining the respondent from navigating the steam-boat *Olive Branch* in the waters between the city of *New-York* and *Troy,* when

there is no voyage made to or from another state in good faith, for the purpose of carrying on the coasting trade, and when no such *bona fide* trade or commerce shall be actually carried on.

ALBANY,
Feb. 1825.

Steam-Boat
Company
*v.*
Livingston.

SUTHERLAND, J. and CRARY, HAIGHT, LAKE, McMI-CHAEL, NELSON, THORN and WILKESON, Senators, concurred.

rect and collusive voyage by way of *New-Jersey.*

SAVAGE, Ch. J. The appellants filed their bill in the Court of Chancery, charging the respondent with a violation of their exclusive right to navigate the internal waters of this state, by navigating on thsoe waters, from *New-York* to *Albany*, with his steam-boat, the *Olive Branch*, for the purpose of carrying passengers. They prayed an injunction to restrain and prevent such navigation.

What the bill charges.

It prays an injunction.

The opposition to the motion for an injunction, rested upon a copy of the enrolment of the steam-boat *Olive Branch*, and a license for the coasting trade, and also the affidavit of the defendant, relying upon an intercourse with the state of *New-Jersey*. The plaintiffs allege, that the intercourse with the state of *New-Jersey* was collusive and fraudulent, and not a *bona fide* voyage to or from another state.

Ground of opposition to this.

The Chancellor granted the injunction to restrain the defendant from navigating directly from *New-York* to *Troy*, when there is no voyage made by the steam-boat to or from another state ; but denied the injunction to prohibit the navigation to or from another state. The latter part of the decree, only, is appealed from.

Order of the chancellor.

The respondent denies any title in the appellants, to an exclusive right of navigation with steam-boats, in the waters of this state ; and contends, that unless their right be first established, the question of fraud or no fraud is altogether immaterial. Under this view of the rights of the respondent, the whole question has been argued by counsel before this Court. I proceed, therefore, to enquire, whether the appellants have any right to the exclusive navigation of the waters of this state, with vessels propelled by steam ; and, particularly, whether they have such right in the waters of the *Hudson River*.

Whether appellants have an exclusive right in the waters of this state.

The appellants have all the right which was granted to *Livingston* and *Fulton*. The validity of that grant is denied. It has been asserted by the Courts of this state ; and denied by the Supreme Court of the *United States*. The point of enquiry, then, will be, whether any part of the grant is still valid ; and, if any, whether it exists as to the waters of the *Hudson River*.

Upon the argument of this cause, the counsel agreed in urging upon the Court the propriety of adhering to former decisions, not overruled, upon the ground that a Court of dernier resort can not review its own decisions, and that its adjudications must remain the law, until altered by legislative authority. It will be useful, therefore, before entering into any discussion as to the constitutionality of the laws in question, to ascertain precisely what has been judicially determined, both by this Court and by the Supreme Court of the *United States ;* that while we adhere with firmness to decisions of this Court, deliberately made, we may recede, with respectful submission, from so much as has been overruled by the superior tribunal.

The decisions upon the steam boat question considered.

The constitutionality of the laws relative to steam-boats, was first drawn in question in the case of *Livingston & Fulton* v. *Van Ingen & others*, (9 *John.* 507.) In that case, the title of the plaintiffs was substantially like that of the appellants here. The defendants were charged with violating the plaintiffs' exclusive right, by navigating with steam boats between *New-York* and *Albany.* The defence in that case differed from this, inasmuch as *no coasting license was shewn.* The defence rested on the ground that, by the adoption of the constitution of the *United States*, the state had parted with all right to legislate on the subject, and that, therefore, the acts were unconstitutional and void. This defence was unanimously overruled by the Court, on the broad ground of the constitutionality of the laws ; but as no decision can be considered absolute authority, except upon a state of facts similar to those adjudicated upon, the case of *Livingston* v. *Van Ingen* is an authority so far as the facts are similar ; but when they differ, it is no farther authority than the reasoning of

Decisions not absolute authority, except upon a similar state of facts.

the Judges is applicable, and then only as the opinions of learned men on the question.

In the case of *Gibbons* v. *Ogden*, (17 *John*. 488) *Ogden*, the complainant, in the Court of Chancery, charged the defendant, *Gibbons*, with an infringement of the exclusive grant to *Livingston* and *Fulton*, which he, *Ogden*, held under an assignment, by his (*Gibbons'*) navigating with his steamboats, the *Stoudinger* and the *Bellona*, between *New-York* and *Elizabethtown Point*. The defendant justified, on the ground that his boats were above 20 tons burthen, and had been duly enrolled and licensed under an act of congress; and he insisted, that under such licenses his boats might be lawfully employed and navigated in the coasting trade, between ports of the same state, or of different states, and could not be excluded or restricted by any law or grant of any particular state. This defence was overruled by the late Chancellor, who did not consider the license as conferring any right whatever. He held, that the license only gave the vessel an American character, but left the owner of the vessel precisely where he was before the license, in respect to the exclusive grant claimed by *Livingston* and *Fulton*, and their assigns. When the cause was brought into this Court, by appeal from the decretal order of the Chancellor, Mr. Justice *Platt*, who delivered the unanimous opinion of the Court, agrees with the Chancellor in the opinion, that the only effect of the license is to determine the national character of the vessel, and the rate of duties which she is to pay; and he adds, that " such a vessel, coasting from one state to another, would have exactly the same right to trade, and the same right of transit, whether she had the coasting license or not:" and the order of the Chancellor was affirmed, on the ground that the question had been settled in the cause of *Livingston* v. *Van Ingen*. The decree of the Chancellor, which was affirmed in this Court, declares the several acts of the legislature of of the state of *New-York*, granting the exclusive right, to be valid, notwithstanding the objections taken by the defendant; " and that the complainant is well entitled to the right exclusively to navigate the waters for the purpose mentioned in the said bill of complaint, with boats moved by

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

*Gibbons* v.
*Ogden* considered.

In chancery.

In this court.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

In the S. C. of
the U. States.

steam or fire; and that the defendant can not lawfully navigate the same, with the steam-boats of him the said defendant, &c. under the respective enrolments and licenses, &c."

When this decree, and the whole proceedings, were carried into the Supreme Court of the *United States*, that Court was of opinion, that the several licenses to the steam-boats, the *Stoudinger* and the *Bellona*, to carry on the coasting trade, &c. " give full authority to those vessels to navigate the *waters of the United States*, by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the state of *New-York* to the contrary notwithstanding; and that so much of the several laws of the state of *New-York*, as prohibits vessels licensed according to the laws of the *United States*, from navigating the waters of the state of *New-York*, by means of fire or steam, is repugnant to the said constitution, and void." The decree was, therefore, reversed.

*The question as to an exclusive right in the waters of this state has not been directly decided;*

The facts in the two cases cited, were not similar to each other, nor to this case. In the first, that of *Livingston* v. *Van Ingen*, the controversy was as to the validity of the state grant, within the bounds of the state; but the effect of a license, under the act regulating the coasting trade, could not be considered, because it was not a fact in the case. In the second case, that of *Ogden* v. *Gibbons*, the effect of a coasting license was considered, both by the Court of Chancery and by this Court, and the license was adjudged to give no right whatever. In this opinion both Courts erred, as is proved by the decision of the Supreme Court of the *United States*; by which it is settled, that a steam-boat navigating with a coasting license, performing a voyage from a port of another state to a port in this state, is authorized to navigate the waters of this state, the laws of this state to the contrary notwithstanding.

*Though it has been virtually decided in Gibbons v. Ogden; both by this court and the S. C. of the United States.*

But though, whether a steam-boat may, under the authority of a license, navigate the waters of the *Hudson* within this state, in opposition to the grant to *Livingston* and *Fulton*, is a question which has not been decided, in terms, by this Court, or the Supreme Court of the *United States*; yet it seems to me to have been virtually decided by both

Courts. In this Court, the only effect of the license was declared to be that of giving an American character, and that it conferred no right in a case of intercourse between this state and the state of *New-Jersey.* Of course, it could have no effect where the intercourse was entirely within the state. In the Supreme Court of the *United States,* the language of the decree is, that " the several licenses to carry on the coasting trade, give full authority to those vessels to navigate the waters of the *United States,* by steam or otherwise, for the purpose of carrying on the coasting trade." I agree, that the decision of the Court is to be considered in reference to the facts of the case, and that the facts in that case were different from this, inasmuch as there the voyage was from a port in another state. Certain points, however, were decided, which were, in a degree, necessary to the main decision given in the cause.

ALBANY,<br>Feb. 1825.<br><br>Steam-Boat<br>Company<br>v.<br>Livingston.

Some of the points decided by the Supreme Court are,

1. That the power to regulate commerce among the states is exclusive.

Points decided<br>by the latter.

2. That commerce means not only traffic, or the exchange of commodities, but also intercourse; that it includes navigation.

3. Congress has power, of course, to regulate navigation. This regulation of commerce and navigation must take place *within* the states : the waters of the *United States* are necessarily the waters of some particular state : congress must act on the subject where it exists.

4. That though the right of intercourse does not depend on the constitution and laws of congress, yet congress has power to regulate that right, and has done so, by " an act for enrolling and licensing ships or vessels to be employed in the coasting trade, and fisheries, and for regulating the same," passed 18*th February,* 1793.

5. That this act implies, unequivocally, an authority to licensed vessels to carry on the coasting trade : the license is the language of the legislature, and transfers to the grantee all the right which the grantor can transfer.

6. That what is meant by the coasting trade is defined in the act of 1793.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

7. That steam boats are to be enrolled and licensed in the same manner as vessels propelled by wind, and are entitled to the same privileges.

It is also intimated, and an opinion expressed, though not judicially decided, that the transportation of passengers is equally a branch of the coasting trade, as the transportation of goods ; that congress has power to license vessels to sail from one port to another in the same state ; and that this power implies no claim of a direct power to regulate the purely internal commerce of a state, or act directly on its system of police.

From these premises it seems to me to follow, as a corollary, that vessels with a coasting license, are authorized to navigate, for the purpose of carrying on the coasting trade in all the navigable waters of the state in which the coasting trade can exist.

If I am correct in these inferences, they lead necessarily to the decision of this cause, and then the objection, that we ought not to go in advance of the Supreme Court, is altogether inapplicable. Before proceeding to apply these principles, it is proper to settle the meaning of certain words and phrases used in this controversy. What, then, do we understand by commerce among the states ? In what does the coasting trade consist ? And what is internal commerce ? Do they interfere with each other, or where is the boundary that marks the limit of each ?

What is meant by " commerce among the states," as used in the consti-tution of the *United States.* It has been contended that commerce among the states, means a voyage from state to state, commencing in a particular state and terminating, as respects the authority of the license, at the boundary line of the state entered ; and that the subsequent progress of the vessel is under state regulations. If this were correct, then the vessel making a voyage from a port in one state to a port in another, must navigate subject to the regulations of the state in which she commences her voyage, until she touches the boundary line of such state ; and at the same moment when she leaves the jurisdiction of the one state, she enters the jurisdiction of the other, and then navigates subject to the regulations of the state she has thus entered, until she completes her

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

voyage. Hence she is under the control of state regulations during her whole voyage, except perhaps at the moment of passing the boundary line. By this construction, congress is ousted of its jurisdiction altogether; and that clause of the constitution which gives them power to regulate commerce among the states, becomes a dead letter. The Supreme Court says, " commerce among the states can not stop at the boundary line of each state, but may be introduced into the interior." Again : " commerce among the states must, of necessity, be commerce within the states." In the same opinion, we find as full a definition of the term as the facts of the case required, and beyond that it was not necessary to go. Accordingly, it is said, " comprehensive as the word ' among' is, it may very properly be restricted to that commerce which concerns more states than one." Again : " the genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally ; but not to those which are *completely* within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The *completely* internal commerce of a state, then, may be considered as reserved for the state itself."

It is evident from these expressions, that the Supreme Court was of opinion, that over a part of the internal commerce of the states, congress has power. Precisely how far that power extends, it did not become necessary to decide ; but from the expressions, *completely internal, exclusively internal*, and *purely internal*, it is clearly inferrible, that all that part of the internal commerce of a state which is not *exclusively internal*, is subject to the regulation of congress. How far, then, within the state, does that commerce extend, which is not *completely* internal ? If all commerce, which enters the exterior lines of a state, is internal, and exclusively so, then all commerce would be included, as well foreign as among the states, which is directly contrary to the decision, and to the constitution. The counsel for the appellants

contended, if a steam vessel from another state, with a coas- ting license, has a right to enter a port in this state, that, at the exterior port, the voyage is terminated as between the states, and that she can not proceed to any other place with- in the state, except in subjection to the exclusive grant. His honour the Chancellor decides, that such a vessel may proceed to any port in this state, and depart from any port in this state and proceed to another, and touch at interme- diate places ; and that the navigation which is subject to the state grant is that which takes place between any two points in this state, when the voyage is not a continuation of a passage to or from another state. The Supreme Court says, " if congress license vessels to sail from one port to another, in the same state, the act is supposed to be necessarily in- cidental to the power expressly granted to congress, and im- plies no claim of a direct power to regulate the purely in- ternal commerce of a state, or to act directly on its system of police."

The power of congress to license vessels to sail from one port to another in the same state, is here distinctly asserted, as incidental to the power directly granted. It seems, also, to be, impliedly at least, admitted, that this is a regulation of commerce within a state, and subject to state legislation. It is elsewhere asserted, that the power to regulate commerce with foreign nations, and among the states, is necessarily an exclusive power. From what is here said, it seems that the incidental power to regulate commerce within the state, is a concurrent power ; and if so, it is admitted, that in case of collision, the law of congress must prevail. But the opin- ion here seems to consider the purely internal commerce as not affected by the act of licensing vessels to sail from port to port within the state. If this be so, then the internal commerce over which the state has exclusive control, is something existing where coasting vessels can not come, or have no right to navigate, as in the case of a ferry within the state. And hence it follows, that the commerce among the states, which congress has power to regulate, either directly or incidentally, is that commerce which may be carried on

It is that which may be carried on in vessels regu- larly licensed by congress ; or, in other words, the coasting trade.

by vessels regularly licensed by the laws of congress ; or, in other words, the coasting trade.

This brings me to the enquiry, what is the coasting trade ? The answer to this enquiry is to be found in the laws of congress, the first of which is entitled, " an act for registering and clearing vessels, regulating the coasting trade, and for other purposes," passed *September* 1, 1789 ; but more particularly in " an act for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same," passed *February* 18, 1793. It can not be necessary to enter into a minute analysis of the sections of this last mentioned act ; a general reference to some of its provisions being sufficient for my present purpose.

This act contains, in the first section, a prohibition to all vessels, except those authorized as is therein provided, from carrying on the coasting trade. The license then gives the authority, or the act regulates a right previously existing, (and it is, in my judgment, immaterial which, for the purpose of deciding this controversy) and particularly specifies the mode of carrying on trade in certain vessels, on the coast or a navigable river, between districts in different states, and districts in the same state, and *different places in the same district.* This, then, is the definition given by congress to the term, " the coasting trade." Chief Justice *Marshall* so understands it, when he says, " The coasting trade is a term well understood. The law has defined it, and all know its meaning perfectly. The act describes, with great minuteness, the various operations of a vessel engaged in it."

According to the definition of the coasting trade, as extracted from the act of congress, of *February* 18, 1793, it means commercial intercourse carried on between different districts in different states, *between different districts in the same state, and between different places in the same district, on the sea coast or on a navigable river.* Agreeably to this definition, a voyage in a vessel of suitable tonnage, from *New-York* to *Albany,* is as much a coasting voyage, as from *Boston* to *Plymouth* or *New-Bedford.* In both, the *termini* are in the same state, and within the navigable waters of the

ALBANY, Feb. 1825.

Steam-Boat Company v. Livingston.

What is meant by " the coasting trade," will appear from the several laws of congress on the subject.
Acts of *Sept.* 1, 1789, and *Feb.* 18, 1793.

The coasting trade is commercial intercourse, carried on between different districts in different states, different places in the same state, and different places in the same district, on the sea coast, or on a navigable river.

*United States*, though in one the navigation is upon a river; in the other on the ocean. The government of the *United States* have no jurisdiction, (the *District of Columbia* and the territories excepted) where a state has not also jurisdiction for state purposes; and I can see nothing in the nature of our governments, which excludes the authority of congress from our navigable rivers. They are arms of the sea. As well might *Louisiana* shut the mouth of the *Mississippi*, or *Virginia* the *Chesapeake*, as *New York* the *Hudson.* In corroboration of this construction, is the fact, that all vessels employed in navigating the river, take a coasting license. I am aware it is said, that the license is given, not under the power to regulate commerce, but the power to lay and collect taxes. When congress have power to do the same act by virtue of distinct powers, they may exercise which they please; and when they profess to act under the power to regulate commerce, as they do in this act, there is no necessity to resort to any other. I need not, therefore, enquire whether the license does not more properly emanate from the taxing power. Under whatever power it is issued, it proves that the vessel has complied with the regulations of congress respecting the coasting trade, and is entitled to all the privileges of coasting vessels. A discussion of this question is superseded by an express adjudication. The language of the Supreme Court is, " To the Court it seems very clear, that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies, unequivocally, an authority to licensed vessels to carry on the coasting trade." Again; " The license must be understood to be what it purports to be, a legislative authority to carry on the coasting trade."

What is meant
by " internal
commerce."

What, then, is internal commerce?

An answer to this enquiry will necessarily lead to some repetition. It is contended by the appellants, and is decided by the Chancellor, that it comprehends all that navigation where the *termini* of the voyage are both within the same state. Chief Justice *Marshall* has said, that the word " among" may properly be restricted to that commerce

which concerns more states than one. Again : " the enumeration pre-supposes something not enumerated ; and that something, if we regard the language or the subject of the sentence, must be the *exclusively* internal commerce of a state. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally : but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself." What is here said, it must be admitted, conveys no definite idea of what is the *completely* or *exclusively internal commerce* alluded to. In a subsequent part of the opinion, an explanation is to be found. When speaking of inspection laws, he observes, " They form a portion of that immense mass of legislation which embraces every thing within the territory of a state not surrendered to the general government; all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c. are component parts of this mass. No direct general power, over these objects, is granted to congress ; and, consequently, they remain subject to state legislation. If the legislative power of the union can reach them, it must be for national purposes ; it must be when the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given. It is obvious, that the government of the union, in the exercise of its express powers—that, for example, of regulating commerce with foreign nations, and among the states—may use means that may also be employed by a state, in the exercise of its acknowledged powers ; that, for example, of regulating commerce within the state. If congress license vessels to sail from one port to another in the same state, the act is supposed to be necessarily incidental

o the power expressly granted to congress, and implies no claim of a direct power to regulate the purely internal commerce of a state ; or to act directly on its system of police."

A definition of what is meant by internal commerce, appears, in part, by the above extract from the opinion of the Supreme Court. To extend it to all its various subjects, would here be entirely useless. The object of the present inquiry is completely answered, by shewing what is not that purely internal commerce spoken of as exclusively subject to state legislation : and I trust I have already shewn, that the navigation of the *Hudson*, a public navigable river, is not included in such internal commerce ; but that it composes a part of the coasting trade, and is, therefore, subject to the regulation and control of congress.

General extent of the coasting trade, as settled by *Gibbons* v. *Ogden*.

In my judgment, then, the case of *Gibbons* v. *Ogden* decides, that the commerce subject to the control of congress, is the coasting trade, which includes the transportation of passengers. That the coasting trade may lawfully be carried on by licensed vessels, in all the navigable waters of the *United States*, including all rivers approachable from the coasts. If this be so, then the *Olive Branch* was engaged in a lawful trade, and had a perfect right to the navigation of the *Hudson*. I will, therefore, detain the Court but a moment, while I add a few general remarks.

The constitution of the *United States* should be so construed as best to promote the great objects for which it was made, avoiding the two extremes of a liberal or strict construction.

Much difference of opinion exists, on the question of construction to be given to the constitution of the *United States* ; some contending that it should receive a liberal construction, and others that it should be construed strictly. In my judgment, it should be so construed as best to promote the great objects for which it was made. This end will be best answered by avoiding either extreme of the rules of construction, and keeping steadily in view the purposes for which the government was instituted, "to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty." Under the articles of confederation, the states were sovereign and independent—too much so for the mutual safety and prosperity of the whole. The states, therefore, in adopting the federal constitution,

Commercial defects of the articles of confederation ; and the objects of the federal constitution.

parted with a portion of their individual sovereignty, in order to give the head of the confederacy stronger powers, by which to draw closer together the different parts of this widely extended government. Before that time, the several states imposed what duties they pleased, not inconsistent with public treaties, and were perfectly sovereign and independent, as to regulating all other commerce within their respective limits, subject to one restriction only, to wit, that the people of other states should enjoy therein all the privileges of trade and commerce, subject to the same duties, &c. as the inhabitants of such state, provided such restrictions did not prevent the removal of property to another state, of which the owner should be an inhabitant, and that no duties should be laid on property of the *United States*, or either of them.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

This power of regulating commerce led to many difficulties and embarrassments, as we learn from the history of the times ; and to prevent a recurrence of those commercial difficulties, was one great and leading inducement to the adoption of the present constitution. Any power, therefore, given to congress, short of the power to regulate that commerce to which the people of the United States had access, would not have secured the object so desirable to be attained : and it never could have been intended that, within the territory of a particular state, congress should define the rights and privileges of citizens of other states, while the state legislature should define the rights and privileges of its own citizens, in relation to the same subject. The framers of the constitution never supposed that they were splitting the jurisdiction over the subject, and leaving it liable to most of the difficulties which previously existed. If the several states may still regulate commerce, within the limits of their states, to the exclusion of congress, there is nothing left for congress to act upon. If the power of congress is limited to voyages commencing in one state and terminating in another, then its jurisdiction is much abridged, and much of the act regulating the coasting trade should be repealed.

Steam-Boat
Company
v.
Livingston.

Co-tempora-
neous    con-
struction of the
constitution,
by acts of con-
gress touching
the    coasting
trade.

To show the understanding of those who framed and adopted the constitution, we have only to look at the acts of congress immediately consequent upon its adoption.    And we find, that at the first session of the first congress, one of the first acts passed, is "an act for registering and clearing vessels, regulating the coasting trade, and for other purposes," passed 1st September, 1789, containing substantially the provisions of the act of 1793.    By this act, licensed vessels are authorised to trade from district to district.    By what authority did congress undertake to regulate the coasting trade ?    The coasting trade is a term not found in the constitution.    It need not be contended to be the execution of the power to collect taxes, &c. ; for it has been decided to have been an execution of the power to regulate commerce.    What commerce ?    Surely not foreign commerce, nor among the Indian tribes ? it must mean, then, "commerce among the several states."    Congress, then, passed the act regulating the coasting trade, under the power to regulate commerce among the several states.    This was a contemporaneous exposition of the constitution with which all were satisfied ; and it was not then thought that state boundaries had any effect or influence upon this kind of navigation.    It was not then thought that the coasting trade, or commerce among the states, must consist of voyages from state to state only : that was the discovery of later times. It was then thought that commerce among the states, meant among the people of the states ; that this commerce was internal as related to the government of the United States and its citizens, and as contradistinguished from foreign commerce.    It was at that time supposed that the constitution intended to guaranty to the citizens of the whole United States an equality of commercial rights and privileges. Hence the restriction on congress, that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another ;" and hence, also, the subsequent provision, that " the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states."    The framers of the constitution thought it unnecessary to declare the converse of the

last provision, to wit, that the citizens of each state shall be entitled within their own state, to all the privileges and immunities which citizens of other states enjoy within such state.

How is this fact under the principle contended for by the appellants ? Citizens of other states, coming from a port in their own state, have a right to navigate freely with their steam boats, in our waters and from port to port, while our own citizens are excluded from such navigation from port to port, unless the voyage extends out of the state. I mention this as an inconsistency growing out of the construction contended for. One leading object of the constitution was to secure an equality of commercial rights to the citizens of the general government, in whatever state they might reside. We ought not to forget that we are the citizens of two distinct, yet connected governments. Each has its proper sphere of action. The powers given to the general government are to be first satisfied. Some of these powers are exclusive, and some concurrent ; but when concurrent, the provisions of the general government are paramount. Whether powers are exclusive or concurrent, is to be determined more by the nature of the power itself, than by the phraseology of the constitution. Under the old confederation, the states retained the character of independent and sovereign states : under the present constitution, for certain specified purposes, the distinction of states is partially lost, and we become a single consolidated government. It is in this character that congress executes its powers ; and having, in this character, power to regulate commerce among the states, that power must necessarily reach the subject where it exists ; and so far as navigation is concerned, it exists where the coasting trade exists, and is therefore subject to the regulations of congress.

We are told that there is great danger of encroachment by the general government, and that the state governments will be swallowed up by it ; and therefore that the state laws should be supported. My answer is, if such danger exists, the states should not provoke a termination of their existence,

ALBANY, Feb. 1825.

Steam-Boat Company v. Livingston.

The powers given to the general government are to be first satisfied. Some of these are exclusive, some concurrent, in which last case, the provisions of the general government are paramount.

For certain purposes the general government is a single consolidated one. In this character congress executes its powers.

by encroachments on their part ; nor should they submit to usurpation. There is no difficulty in harmonizing. if each government will be content with the powers possessed by it. But why should we more apprehend an abuse of power, or an act of usurpation, by the general than by the state governments ? Both are constituted by the representatives of the people. Every member of the national legislature is a citizen of some state and of course feels his state partialities and perhaps jealousies ; and should be presumed, in the absence of proof to the contrary, equally jealous of the rights of his constituents, as the members of our state legislatures. I am fully sensible of the propriety of preserving the state governments, with all their rights and powers : but this is by no means inconsistent with conceding to the general government its appropriate powers.

We were cautioned upon the argument, to beware how we admit the authority of congress to regulate navigation within the waters of the *Hudson*, as we should thereby abandon the right to license ferries and receive tolls on our canals. The Supreme Court expressly disavows any authority in congress to interfere with the purely internal commerce or police of a state. Ferries may be subject to the acts of congress, so far as they are used for carrying on the coasting trade ; but those ferries which are the subjects of state grant, if they can be called commercial regulations at all, belong clearly to the internal commerce of the states. We are told that the grant to the plaintiffs is only a ferry from *Albany* to *New York*. If the exclusive grant be really a right of ferry, the plaintiffs may occupy with their boats every ferry in the state, and thus destroy the rights of all others. But there is no pretence for denominating their grant a ferry. To speak of a ferry from *New-York* to *Albany*, is as great an abuse of terms, as to talk of a ferry from *New-Orleans* to *St. Louis* or *Pittsburgh*, or even from *New-York* to *Liverpool*. Those ferries over which the state exercises its appropriate authority, are not connected with the coasting trade ; they are not, in the constitutional sense, commercial regulations. But if they were, they belong to that exclusively internal commerce over which congress has no control. Our right to

*Congress have no right, under their power to regulate commerce, to interfere with the ferries of the state, except so far as they are used for carrying on the coasting trade ;*

regulate navigation upon our canals rests upon a still firmer basis. They are no part of the navigable waters of the *United States* within the act regulating the coasting trade, or the constitution. Congress may, indeed, under the taxing power, impose taxes upon canal boats, as they may upon every species of property within the states; but that gives them no direct power to regulate the navigation upon our canals, or upon our inland lakes and rivers. The authority of congress to regulate navigation is confined to our coasts, bays and navigable rivers.

If I am correct in the views which I have taken of this subject, an injunction can not be granted, whether the respondent carried on what has been denominated a fraudulent intercourse with *New-Jersey* or not. I forbear, therefore, an examination of that part of the decree of his honor the Chancellor, which relates to such intercourse.

But even if the conclusions which I have drawn from established premises, be not admitted as absolutely correct and conclusive, is there no *doubt* on the subject? After the highest judicial tribunal in our country has said, that " so much of the several laws of the state of *New-York* as prohibits vessels, licensed according to the laws of the *United States* from navigating the waters of the state of *New-York* by means of fire or steam, is repugnant to the said constitution and void," can it be pretended that the claim of the appellants is no longer doubtful? The plea in the case of *Gibbons* v. *Ogden* distinctly asserted the right to navigate between different places in the same state. This was part of the issue; yet the Court broadly assert the right of licensed vessels " to navigate the waters of the *United States* by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the state of *New-York* to the contrary notwithstanding." In *Livingston* v. *Van Ingen*, the late Chancellor *Kent* says, " injunctions are always granted to secure the enjoyment of statute privileges, of which the party is in the actual possession, UNLESS THE RIGHT BE DOUBTFUL." This is undoubtedly the correct rule, and the true result of an examination of the adjudged cases.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

Nor can they interfere with the navigation upon our canals; for they are not navigable waters, within the meaning of the constitution, &c. So of our inland lakes & rivers.
But congress may, under their taxing power, tax canal boats, or any other property.
The authority of congress to regulate navigation is confined to our coasts, bays, & navigable rivers.

An injunction should not be granted to secure a claim to statute privileges if the right be doubtful.

ALBANY,
Feb. 1825.

Steam-Boat
Company
v.
Livingston.

If any thing were wanting, in addition to the express and unequivocal language of the Supreme Court of the *United States* to shew that the appellants have not a *clear right, free from doubt*, it is found in the peculiar situation in which an injunction will place the citizens of this state. They are forbidden rights, which are open to, and may be enjoyed freely by all the world beside. If the injunction is granted, it can not secure to the appellants their monopoly. The citizens of other states, with their steam boats, have full right to navigate our waters and carry on a profitable business, commencing or terminating their voyage in their own state ; while our own citizens must stand with their arms folded and look on, unless they, too, terminate their voyages without the state. If this deplorable state of things necessarily results from the constitution and laws of our country, it must be submitted to, with what grace we can ; but is it not a powerful argument to prove that the reasoning which leads to such a result is unsound ?

For these reasons, I am of opinion that an injunction ought not to be granted ; and that that part of the decree of his honor the Chancellor, refusing an injunction, be affirmed.

For affirm-
ance, 22—for
reversal, 9.

BOWMAN, BRAYTON, BURROWS, BURT, CLARK, CRAMER, DUDLEY, EARLL, ELLSWORTH, GARDINER, KEYES, LEFFERTS, LYNDE, MALLORY, McCALL, McINTYRE, MORGAN, REDFIELD, WARD, WOOSTER, WRIGHT, Senators, concurred.

OGDEN, Senator, gave no opinion.

A majority of the Court concurring with the Chief Justice, it was thereupon ORDERED, ADJUDGED, and DECREED, that that part of the decree of his honor the Chancellor, appealed from be affirmed, with costs, &c.